# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |  |
|---|---|---|
| LEANN ROSSI, THERESA MCGRUDER, ANSLEY PASCOLI, DEBRA POOLE, CHERYL SMALLS, and REBECCA CANADA, | : : : : : | |
| | : | CIVIL ACTION FILE |
| Plaintiffs, | : | NO. 1:10-CV-4254-RWS-AJB |
| | : | |
| v. | : | |
| | : | |
| FULTON COUNTY, GEORGIA, | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES MAGISTRATE JUDGE'S ORDER AND NON-FINAL REPORT AND RECOMMENDATION

In this action, Plaintiff Ansley Pascoli raises employment-discrimination claims against Defendant Fulton County, Georgia, under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*. (Am. Compl. [Doc. 16]). Presently before the Court is Defendant's Motion for Summary Judgment as to Plaintiff Ansley Pascoli. [Doc. 163]. For the reasons set forth below, the undersigned **RECOMMENDS** that the District Judge **GRANT** the motion in full.

## I.    Background

As required when considering a motion for summary judgment, the Court has

viewed the evidence and reasonable factual inferences in the light most favorable to

Plaintiff, the nonmoving party.[1] *See United States v. Four Parcels of Real Prop.*,

941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).  To the extent that material facts are in

dispute, the Court has resolved the disputes in Plaintiff's favor.[2] *See Vaughan v. Cox*,

343 F.3d 1323, 1326 n.1 (11th Cir. 2003).  The Court does not, however, accept legal

conclusions, masquerading as facts, as true.[3] *See Day v. Taylor*, 400 F.3d 1272, 1277

---

[1]      Paragraph numbers preceded by "D" refer to Defendant's Statement of Material Facts, as to Plaintiff Ansley Pascoli, to Which There Are No Genuine Issues To Be Tried, filed in support of its motion for summary judgment, [Doc. 163-1], and paragraph numbers preceded by "P" refer to Plaintiff Ansley Pascoli's Statement of Material Facts Which Present a Genuine Issue for Trial, [Doc. 205-3], filed in opposition to Defendant's motion for summary judgment.  Plaintiff's and Defendant's responses to the statements of material fact will be designated as "Pl. Resp.," [Doc. 205-2], and "D. Resp.," [Doc. 221-1], respectively.

[2]      The Court notes that for the purposes of resolving a motion for summary judgment, "facts" may not be considered unless they are unopposed or supported by citations to admissible evidence.  *See* Fed. R. Civ. P. 56(c); LR 56.1(B).  For this reason, when the opposing party has pointed out that the evidence cited to support a factual statement is unsupportive, the Court has edited the fact to recite only the portion supported by the evidence, and in cases in which the citation is absent or unsupportive, the Court has omitted the statement of fact entirely.  (*See, e.g.*, P ¶¶ 30-31, 33, 50).

[3]      Accordingly, where a party has properly asserted an objection, the Court has disregarded statements of material fact or portions thereof that state legal

AO 72A
(Rev.8/8
2)

(11th Cir. 2005). The facts of the case, for the purpose of adjudicating Defendant's motion for summary judgment, are therefore as follows.[4]

Plaintiff, who was born on December 5, 1950, is a white female over forty years of age. (D ¶¶ 1-2; P. Resp. ¶¶ 1-2). She became employed with Defendant in November 1993. (D ¶ 4; P. Resp. ¶ 4). She worked as assistant to the chairman of the Fulton County Board of Commissioners from 1993 to 1998. (D ¶¶ 4-5; P. Resp. ¶¶ 4-5). From 1998 to 1999, she worked in the Fulton County Department of Public Buildings as "a planner and implementer of an ADA building program." (D ¶ 6; P. Resp. ¶ 6). Plaintiff then worked in the office of the chairman of the Fulton County Board of Commissioners from 1999 to 2002. (D ¶ 7; P. Resp. ¶ 7). In 2002, Plaintiff began working in the Fulton County Tax Assessor's Office as an Appraiser Trainee. (D ¶ 8; P. Resp. ¶ 8).

_____

conclusions. (*See, e.g.*, P ¶¶ 23-24, 36-37, 42, 46).

[4] The facts recited in this section are intended to establish the context of the case. Additional facts pertinent to the parties' arguments will also be recited in the discussion section below. Statements of fact that have no apparent materiality and are not referenced in the parties' arguments have not been included. *Cf. Ward v. United States*, 154 F.R.D. 291, 293 (M.D. Fla. 1994) (refusing to supply argument for party).

AO 72A
(Rev.8/8
2)

The Fulton County Tax Assessor's office is responsible for valuing the properties in over 2700 residential neighborhoods in Fulton County. (D ¶ 21; P. Resp. ¶ 21). The management hierarchy within the Fulton County Tax Assessor's Office is as follows: (1) Chief Appraiser, (2) Assistant Chief Appraiser, (3) Deputy Chief Appraiser, and (4) Appraisal Managers. (D ¶ 26; P. Resp. ¶ 26). Burton Manning served as Chief Appraiser of the Tax Assessor's Office from July 2006 until February 2012. (D ¶¶ 27-28; P. Resp. ¶¶ 27-28). As Chief Appraiser, Manning had the overall responsibility for the Tax Assessors' Office, including approval of all training and travel requests within the department and final decisionmaking authority as to all hiring, promotion, and disciplinary decisions. (D ¶¶ 29-31; P. Resp. ¶¶ 29-31). Tony George served as Assistant Chief Appraiser from June 2006 until April 2010. (D ¶¶ 32-33; P. Resp. ¶¶ 32-33). As Assistant Chief Appraiser, George was responsible for the day-to-day operations of the Tax Assessors' Office, including successfully guiding the office in preparing the annual tax digest and efficiently and effectively handling appeals for Fulton County. (D ¶ 34; P. Resp. ¶ 34). Douglas Kirkpatrick was hired as the Deputy Chief Appraiser on November 18, 2008. (D ¶¶ 36-37; P. Resp. ¶¶ 36-37). As Deputy Chief Appraiser, Kirkpatrick is responsible for the day-to-day operations of the residential division of the Tax Assessors' Office. (D ¶ 38; P. Resp. ¶ 38). Kirkpatrick

4

is also responsible for making all assignment and reassignment decisions within the residential division based on departmental needs. (D ¶ 39; P. Resp. ¶ 39).

Fulton County is divided into four regions, with a residential manager assigned to each region. (D ¶ 22; P. Resp. ¶ 22). Plaintiff was assigned to the North appraisal section, the geographic area in Fulton County that is north of the Chattahoochee River. (D ¶ 9; P. Resp. ¶ 9). While she was an Appraiser Trainee, Plaintiff worked out of the Tax Assessor's office at 141 Pryor Street in downtown Atlanta. (D ¶ 10; P. Resp. ¶ 10).

In 2005, Plaintiff was promoted to the position of Property Appraiser and was reassigned to the Office of Tax Assessor's North office location, which was then located in Roswell, Georgia. (D ¶¶ 14-15; P. Resp. ¶¶ 14-15). She reported to Appraisal Manager Tim Brown. (P ¶ 20; D. Resp. ¶ 20; D ¶ 59; P. Resp. ¶ 59). In her role as an Appraiser, Plaintiff's responsibilities include appraising real property, collecting cost data regarding construction costs, and determining property depreciation schedules.[5] (D ¶ 16; P. Resp. ¶ 16).

In 2007, Plaintiff was assigned Data Collector Terrence Wortham to assist her with permits and new construction but not with appeals. (D ¶ 92; P. Resp. ¶ 92;

_____

[5]     It appears that Plaintiff still holds the Appraiser title.

5

Pl. Aff. ¶ 25; Pl. Dep. at 68). It was office policy that Data Collectors could assist Appraisers by measuring houses and taking pictures, but they could not place a value on a property or sign off on the property. (D ¶ 97; P. Resp. ¶ 97; Pl. Aff. ¶ 11 & Exh. A [Doc. 199-1]).

In 2009, Plaintiff complained to Brown that he was showing preferential treatment to Pascoli's coworkers Aimee Martinez and Rasheeda Ramos, who Plaintiff believed were regularly permitted to come in late and take extended lunches, while Pascoli was held to a strict schedule.[6] (P ¶ 21; D. Resp. ¶ 21; D ¶ 80; Pl. Resp. ¶ 80). Martinez and Ramos are African-American. (P ¶ 23; D. Resp. ¶ 23; Pl. Aff. ¶ 12). Plaintiff also complained that Ramos and Senior Appraiser Mark Dowdell were using Data Collectors for inspecting properties in appeal and was upset to discover that

---

[6]    Plaintiff also states that she "complained that it was unfair to treat white employees over 40 different than other employees." (P ¶ 22). As evidence for this statement, she cites Defendant's statement of material fact paragraph 82. (*Id.*). Defendant's statement of material fact 82, however, states only that Plaintiff "*alleges* that she complained to Brown that it was unfair to treat white employees over the age of forty differently than other employees" and cites to the amended complaint. (D ¶ 82 (citing Am. Compl. ¶ 136) (emphasis added)). The amended complaint is not verified. (*See* Am. Compl.). As a result, it may not be used as evidence of the facts stated therein. *See* LR 56.1B.(1)(b) ("The court will not consider any fact . . . supported by a citation to a pleading rather than to evidence). The Court therefore disregards Plaintiff's statement of material fact 22 and all other statements of material fact or portions thereof to which the opposing party has objected and which rely on citations to pleadings. (*See also, e.g.,* P ¶¶ 33, 59).

AO 72A
(Rev.8/8
2)

Brown had given them express permission to disregard the office policy against using Data Collectors for that purpose. (P ¶¶ 26, 28; D. Resp. ¶¶ 26, 28; Pl. Dep. 44-47). Dowdell is a black male who is substantially younger than Plaintiff. (P ¶ 27; D. Resp. ¶ 27). During approximately the same time period, Ramos complained during a meeting that Plaintiff had better access to building permits than she did; although Brown was not in the meeting, he later restricted Plaintiff's use of the permits. (P ¶ 29; D. Resp. ¶ 29; Pl. Dep. 85-86). This was atypical—Residential Appraisers were otherwise encouraged to use building permits to pick up new construction. (D¶ 109; P. Resp. ¶ 109).

After that, Ramos excluded Plaintiff from office festivities such as birthday celebrations and group lunches. (D ¶ 111; P. Resp. ¶ 111). When Plaintiff complained to Brown, he ridiculed her by responding that he was not invited to participate in the events either. (Pl. Dep. 92-93). Brown also excluded Plaintiff from a "closed door" meeting he held with Martinez and Ramos to discuss Plaintiff's complaints of exclusion. (D ¶¶ 118-19; P. Resp. ¶¶ 118-19; Pl. Dep. 97).

On June 22, 2009, Plaintiff was notified via e-mail from Deputy Chief Appraiser Kirkpatrick that she was being reassigned to the 14th District, effective July 8, 2009. (D ¶ 142; P. Resp. ¶ 142). Plaintiff met with Manning to discuss the reassignment.

7

(D ¶ 146; P. Resp. ¶ 146). He told her that he delegated to his managers the power to assign where people work. (D ¶ 146; P. Resp. ¶ 146). Kilpatrick, who was aware that Plaintiff had made complaints about favoritism and being left out of office functions, (Kirkpatrick Dep. at 55-57; Manning Dep. 139-40), made the transfer decision, (P ¶ 44; D. Resp. ¶ 44; D ¶ 144; P. Resp. ¶ 144).

The 14th District spans from Inman Park down to the Clayton County line and includes neighborhoods such as the Vine City, Pittsburgh, Mechanicsville, Lakewood, West End, and Grant Park communities. (D ¶ 23; P. Resp. ¶ 23). Plaintiff was assigned property-appraisal responsibilities in the Grant Park and South Atlanta areas. (D ¶ 153; P. Resp. ¶ 153). Although Plaintiff's salary and benefits remained the same after the transfer, (D ¶¶ 212-13; P. Resp. ¶¶ 212-13), and the methodology used to appraise properties in the 14th District and the North Region are the same, (D ¶ 160; P. Resp. ¶ 160), Plaintiff found that her new assignment in the 14th District differed greatly from the one she left in the North office. In the 14th District, Plaintiff was confronted with what she describes as very dangerous situations, including encountering pit bulls and having her car surrounded by a group of homeless people. (D ¶ 155; P. Resp. ¶ 155; Pl. Aff. ¶ 22). She also found the real estate markets to be "completely different," (D ¶ 157; P. Resp. ¶ 157), and felt unprepared to handle the

AO 72A
(Rev.8/8
2)

high incidences of foreclosure and mortgage fraud found in certain pockets of the 14th District, (D ¶¶ 158-60; P. Resp. ¶¶ 158-60). Her new supervisor promised to train her on the unique issues presented by the high foreclosure and mortgage-fraud rates, but she never did. (P ¶¶ 54, 58; P. Resp. ¶¶ 54, 58).

On or about July 22, 2009, Plaintiff filed a grievance with the Fulton County Grievance Committee regarding her reassignment to the 14th District. (D ¶¶ 149, 211; P. Resp. ¶¶ 149, 211). In the grievance, Plaintiff stated the following:

> During her employment in the North Appraisal office, Ms. Pascoli complained to Timothy Brown, her supervisor in the North office, regarding:
>
> 1. Preferential treatment of certain employees, especially a Ms. Rasheeda Ramos, who has chronic tardiness issues as shown by an audit. Mr. Brown had refused to address the problem;
>
> 2. The aggressive action of certain employees to exclude other employees, including Ms. Pascoli, from office functions. Management did nothing in response to Ms. Pascoli's concerns and complaints;
>
> 3. Inconsistent treatment of equal-level employees. Management did nothing in response to Ms. Pascoli's complaints;
>
> 4. Selective treatment and inconsistent application of policies, particularly in connection with the requirement that Appraisers only could appraise houses under appeal. For some employees, there was a requirement of appraisers only, while for other employees, data techs were permitted to be used. Ms. Pascoli complained to

Mr. Brown about this inconsistent and special treatment but her concerns were ignored, and in fact, Mr. Brown told Ms. Pascoli that he had given permission to the other employees to use the data techs, whereas Ms. Pascoli was specifically told she could not use data techs;

5.     On June 23, 2009 Ms. Pascoli was excluded by Timothy Brown from a management meeting with employees;

6.     On June 24, 2009 at about 3:00 p.m., Ms. Pascoli met with Chief Appraiser Burt Manning and asked about training to complete level 4 requirements. These requirements were put into force by Mr. Manning. She then inquired about promotional opportunities and what positions were available in the department, as she was interested in additional challenges, and mentioned the commercial area. Mr. Manning stated that others had applied before her, so they would be in line before she would be considered. At no time during this meeting did Mr. Manning mention the upcoming transfer of Ms. Pascoli, which was not known to her at the time;

7.     On June 24, 2009, after her meeting with Burt Manning, Ms. Pascoli was copied on a string email from Douglas Kirkpatrick and learned for the first time at about 4:30 p.m., after returning to the North office, that another employee was going to start reporting to the North office and she (Pascoli) would be reporting to the Downtown Atlanta office starting July 8, 2009. This was never discussed with Ms. Pascoli by anyone and Ms. Pascoli had no notice before receiving this group email. The transfer to the Downtown office, after she had been recruited for the North office, took place without any notice or explanation to Ms. Pascoli. Shortly thereafter the July 8th date was moved up to June 29th for reporting purposes;

8.     Subsequent to receiving the email about her transfer, Ms. Pascoli was advised by her supervisor Timothy Brown that prior to the June

10

24, 2009 transfer email, he had reported her previous complaints to Douglas Kirkpatrick. Therefore, it seems clear that Ms. Pascoli was transferred without notice for complaining about poor management, inconsistent treatment of employees of equal status and inconsistent application of policies;

9. Once at the Downtown office, Ms. Pascoli was refused any explanation about her transfer. The only thing she has been told is that her supervisor Timothy Brown told Douglas Kirkpatrick about her complaints about inconsistencies and treatment, and claimed it was Douglas Kirkpatrick that had her transferred, not him;

10. At the downtown office, upper management has ordered her to work on appraisals in dangerous parts of town. Her then-supervisor, Theresa McGruder, expressed concern to Ms. Pascoli for her safety in this particularly dangerous area and has asked her to be extremely careful.

11. Once Ms. Pascoli reported to the Downtown office she was forced to deal with completely different situations related to appeals, involving numerous foreclosures for which she had not been trained, nor had the process been explained. Her supervisor, Theresa McGruder, was to meet and explain but she was terminated. Then, her current supervisor, Cheryl Smalls, said she would meet and explain the process, but later on July 22, 2009 told Ms. Pascoli that she did not have time and Ms. Pascoli would have to "take ownership" of the appeals folders, or figure it out herself. Thus, Ms. Pascoli: was transferred without her approval and without notice or discussion, assigned to completely different areas of appeals with numerous foreclosures, was refused explanation or education and was sent to violent and dangerous neighborhoods for which her now-terminated supervisor expressed serious concerns for her safety;

11

AO 72A
(Rev.8/8
2)

The inappropriate transfer was made for retaliatory, improper and illegal reasons and has led to a decrease in pay for Ms. Pascoli since she has additional costs like extra driving, parking and tolls. This transfer has also caused her great physical and emotional stress.

(Brown Dep., Exh. 1 [Doc. 231-4]).

Plaintiff requested the following remedies:

1. A return to the North Appraisal office and back to Region 5 responsibility;

2. Reimbursement to her for the decrease in pay suffered as a result of increased costs to her associated with the transfer related to extra parking, tolls and travel expenses;

3. That the County pay for her requested training for certification, as discussed with Burt Manning;

4. That she receive reimbursement for costs in connection with the filing of this grievance, including attorneys' fees and expenses; and

5. Other relief as may be requested at a later date or deemed appropriate by County officials.

(Brown Dep., Exh. 1 [Doc. 231-4]). After Plaintiff filed the grievance, George would mock her in front of other employees, stating that they had "better watch it or I'll file a grievance about being left out." (Pl. Dep. at 112). Plaintiff ultimately withdrew the grievance because she did not believe that management was taking the issues raised in the grievance seriously. (D ¶ 150; P. Resp. ¶ 150).

AO 72A
(Rev.8/8
2)

On or about September 4, 2009, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").[7] (D ¶ 210; P. Resp. ¶ 210).   In the section of the form indicating the cause of the alleged discrimination, Plaintiff checked the boxes marked "race," "sex," "age," and "retaliation," and she also checked the box marked "other" and specified "42 USC [§§] 1983/1985."   (Pl. Dep. Exh. 5 [Doc. 192-1 at 13]).   She also indicated that the discrimination took place from 2008 through June 2009.  *Id*.  The particulars of Plaintiff's charge were as follows:

> I am a White Female over 40 years of age.  I believe I have been discriminated against by my employer, The Fulton County Board of Assessors, because of my race, gender and age, retaliated against for protesting discriminatory treatment, expressing my Constitutionally guaranteed freedom of speech, and denied equal protection under the law under 42 USC Section 1983 and 1985.

> I have worked for my employer, Fulton County, for 16 years.  I am highly qualified to perform my job as a State DOR certified Level 3 tax appraiser, and very soon will achieve the Level 4 designation, which is the highest available.   I have not received any negative performance appraisals.

> Earlier this year, I complained to my supervisor in the Alpharetta office, Mr. Tim Brown, Black, Male, that he was showing preferential treatment to certain employees, namely Ms. Rasheeda Ramos, a Black Female under 40, who was proved to have a problem with chronic

---

[7]    The EEOC assigned the matter Charge No. 410-2009-05868. (Pl. Dep., Exh. 5 [Doc. 192-1 at 13]).

13

AO 72A
(Rev.8/8
2)

tardiness by an internal Board of Assessors audit. I stated that it was unfair for other, white employees over 40, to enforce work hours against us, but not against chronic offenders who were his pets. Ms. Rasheeda Ramos, Black, Female, under 40, who was not able to access useful *permit* information, complained that I was able to work within my area of responsibility and obtain information helpful to me. Since she was not able to achieve this same access in her own appraisal area she demanded that I be denied access to the information in my area, and demanded that restrictions be put on me to prevent me from doing my job just because she could not. I objected to this unreasonable situation, and these irrational demands, but in compliance, my supervisor, Mr. Brown, Black Male, restricted my access to information, thus interfering with my ability to perform my job.

Subsequently, Ms. Ramos engineered efforts to exclude me and other white employees from office functions. I complained to Mr. Brown, but neither he nor other county management did anything. Mr. Brown, instead, ridiculed me, and attempted to corroborate with other employees that my complaint was not valid. Again, he refused to deal properly and appropriately with my situation, whereas, whenever Black Females complained about anything, he was quick to remedy their complaints in any way possible.

Additionally, management announced a policy requiring that only Appraisers, like myself, not data technicians or office assistants, could appraise houses under appeal to the Board of Assessors. I was not allowed any data technician assistance, but Mr. Brown allowed data technicians to assist Black, Male and Female, and younger Appraisers. I brought this issue to Mr. Brown's attention but he specifically told me I could not use the data technicians for assistance with appeals. Then, he said he had given his specific approval to two younger black appraisers to use the data technicians.

On January 23, 2009, Mr. Brown excluded me from a management meeting with other employees in the Alpharetta office.

14

On June 24, 2009, I learned via a string of emails, not originally directed to me, that I was being transferred to the downtown Atlanta Pryor Street office effective July 8, 2009, but moved up to June 29, 2009. No reason was given for this transfer, although I learned I was being swapped with another White Female employee, Leann Rossi, who had expressed her opinion in variance with top management in the Pryor Street office, and also complained about discriminatory treatment against Whites and Women by Assistant Chief Appraiser Tony George, a Black, Male.

I was given no notice about this transfer which I opposed. No management personnel ever explained why I was being transferred at the time. I did learn from my supervisor Tim Brown that he had informed his supervisor Mr. Doug Kirkpatrick, White, Male, of all my previous complaints.

I grieved the transfer internally with the county, and was told by Mr. Kirkpatrick that I was transferred in a swap with Leann Rossi because he knew that I had complained about situations in the Alpharetta office. These complaints were about poor management and discriminatory actions taken by Black, Male members of management such as Tim Brown in the Alpharetta office.

Once I reported to the Pryor Street office, I was given completely different work assignments to deal with regarding appeals in very violent and dangerous parts of town. I was warned to be careful by my new supervisor, Ms. Theresa McGruder, Black, Female, who also expressed that she thought it inappropriate that management had assigned me to such a bad and dangerous area to handle appeals, without any training whatsoever on the differences the foreclosure market in this area will make to appeals in the South Atlanta area versus the North Atlanta area where I was familiar with the techniques. Ms. McGruder was then fired from her job of 30 years.

My new supervisor was Ms. Cheryl Smalls, Black, Female, under 40, who promised to explain the different types of appeals in South

15

Atlanta to me. She never did and later told me to "take ownership" of my responsibility without any training. My prior supervisor, Ms. McGruder, had told me that everyone else had been trained in the different techniques and processes in the area I had been assigned, but they were all Black. Plus she and others asked who had I offended, or what had I done wrong to get such a terrible and dangerous assignment. It was also reported to me that any Appraiser that management did not like, particularly women, received assignments in these dangerous areas to punish employees for expressing their opinion or complaining about discrimination or other workplace issues, or also, punished by being moved to create a more difficult commute.

My grievance about the transfer was denied by Mr. Doug Kirkpatrick who said he made the decision because I had complained at work about several things, and it was also denied by Chief Appraiser, Burt Manning, White, Male. However, when transferred, I was put in Leann Rossi's assigned territory, and there had been and are job openings for Appraisers in the Alpharetta office which have been denied to me despite my requests to be returned to the Alpharetta office. The openings include my previously assigned Region in north Atlanta, and to date my position remains unfilled.

I believe I have been discriminated against because my race, White, my gender (sex), and my age and that I was also transferred in retaliation for complaining about discrimination to county management. I also believe this discrimination and retaliation resulted in my being assigned to the worst possible areas of town where it is violent and dangerous in order to punish me, and for which management refused to provide me appropriate job training.

I have been humiliated and embarrassed by this discriminatory and retaliatory transfer and dangerous job assignment. Because of the costs involved it has resulted in a reduction of pay. I have been placed in a work environment that is dangerous to my health and safety intentionally by top management at the Fulton County Board of Assessors. I believe

16

> I have been discriminated and retaliated against in violation of Title VII
> of the Civil Rights Act of 1964, the Age Discrimination in Employment
> Act of 1967, and 42 USC Section 1983 & 1985.

(Pl. Dep., Exh. 5 [Doc. 192-1 at 14-16]).  On September 30, 2010, the EEOC issued a notice of right to sue in which it explained that it was terminating its processing of the charge because more than 180 days had elapsed since the date the Commission assumed jurisdiction over the charge, the Commissioner had not filed suit, and Plaintiff had requested the notice.  [Doc. 1-1 at 18].

In 2010, Plaintiff applied for at least three Senior Appraiser positions. (P ¶ 34; D. Resp. ¶ 34).  Brian Gardner, an African-American male who was substantially younger than Pascoli, received one of the positions. (P ¶ 35; D. Resp. ¶ 35).  Steven Hooker, an African-American male, received another of the positions.  (P ¶ 37; D. Resp. ¶ 37).  David Robinson, also an African-American male, received the other position.  (P ¶¶ 40, 42; D. Resp. ¶¶ 40, 42).

In 2010, Plaintiff was reassigned to the North Region.  (D ¶ 183; P. Resp. ¶ 183). Plaintiff agreed to be reassigned on the condition that she be assigned to Region Five. (D ¶ 188; P. Resp. ¶ 188).  Kirkpatrick later told her that Region Five was unavailable and that she would be assigned to Region Four.  (D ¶ 189; P. Resp. ¶ 189).  Plaintiff's

salary and benefits remained the same following her reassignment. (D ¶¶ 215-16; P. Resp. ¶¶ 215-16).

Plaintiff, along with McGruder, Smalls, Rossi, and one other person, filed suit on December 30, 2010.[8] [Doc. 1]. Plaintiff Pascoli raises claims in Counts Two, Three, Four and Five. (*See* Am. Compl., *passim*). She alleges in Count Two that Defendant violated the ADEA when it: transferred her after she "complained about discriminatory actions"; permitted younger employees to use "certain information to do their jobs" but denied Plaintiff access to the information; permitted Plaintiff to be "excluded from office functions while younger employees were permitted to attend"; and gave "[t]ools and other privileges of employment" to younger employees but did not give them to Plaintiff. (*Id.* ¶ 201). She alleges in Count Three that Defendant committed gender discrimination in violation of Title VII when it: transferred her because of her gender; permitted male employees to use certain information to do their jobs but denied Plaintiff access to the information; permitted Plaintiff to be "excluded from office functions and meetings while male employees were not"; gave "[t]ools and other privileges of employment" to male employees but did not give them to Plaintiff; and

---

[8]　On March 21, 2011, the Court granted leave to add a sixth plaintiff. [Doc. 10].

allowed management to mock her and act in a hostile and sarcastic manner to her and treat her and other women with disrespect, unlike males, who were treated with respect. (*Id.* ¶ 213). She also generally avers that "Plaintiffs were treated differently, harassed, humiliated, abused, insulted, ignored, transferred, demoted, reduced in status and responsibility, denied promotions, disciplined, terminated, retaliated against and otherwise discriminated against by Defendant's officers and management based on their gender." (*Id.* ¶ 215). In Count Four, Plaintiff alleges that Defendant committed race discrimination in violation of Title VII when it: transferred her because of her race; permitted black employees to receive assistance with their jobs but denied Plaintiff the opportunity to receive help; permitted Plaintiff to be "excluded from office functions and meetings while black employees were not"; disciplined her for tardiness while permitting black employees to be tardy; ignored her complaints about employment but listened to black employees; and set hours for white employees while permitting black employees to set their own hours. (*Id.* ¶ 221). She also generally alleges that she and two other plaintiffs were "were treated differently, transferred, disciplined, humiliated, excluded, assaulted, ignored, demoted and/or otherwise discriminated against due to their race." (*Id.* ¶ 223). She alleges in Count Five that Defendant retaliated against her in violation of Title VII in response to her complaints that "black employees under 40

19

were being given preferential treatment by Defendant's management"; her grievance; and her EEOC charge. (*Id*. ¶ 227). She alleges that in response to her complaints, Defendant denied her "tools to do her job and other assistance afforded to other employees"; allowed her to be mocked and excluded from office functions; transferred her and refused to move her back to her original territory despite job openings; gave her "dangerous assignments in violent areas"; and allowed her to be "treated in a sarcastic and hostile tone." (*Id*. ¶ 232). Defendant moves for summary judgment on all of Plaintiff's claims. [Doc. 163].

## II.   *Standard of Review*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party carries the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991).

AO 72A
(Rev.8/8
2)

The non-moving party is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* If the record does not blatantly contradict the nonmovant's version of events, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *See Anderson*, 477 U.S. at 252; *see also EPL, Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999).

### III.    *Legal Framework*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

AO 72A
(Rev.8/8
2)

respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee for her participation in certain statutorily protected activities:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a); *see also Biniashvili v. Bohne*, 397 Fed. Appx. 597, 598-99 (11th Cir. Sept. 28, 2010).

The ADEA likewise makes it unlawful for an employer, *inter alia*, "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also prohibits discrimination against any employee because she "has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). The Eleventh Circuit Court of

AO 72A
(Rev.8/8
2)

Appeals has held that the same "principles governing the order and allocation of proof in cases arising under Title VII" apply to claims arising under the ADEA as well. *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995).

A plaintiff asserting a claim under Title VII can support her claim either by direct or circumstantial evidence. *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). If direct evidence of intentional discrimination does not exist or is insufficient, a plaintiff may offer circumstantial evidence, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lawver v. Hillcrest Hospice, Inc.*, 300 Fed. Appx. 768, 772 (11th Cir. Nov. 24, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)).

> This framework requires the plaintiff to establish a *prima facie* case of discrimination, and then the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employment action it took. The burden then shifts back to the plaintiff to demonstrate that the proffered reason was pretextual. The plaintiff can establish pretext by showing that the employer's non-discriminatory reason should not be believed, or, when considering all the evidence, that it is more likely that the discriminatory reasons motivated the decision than the employer's proffered reasons.

*Lawver*, 300 Fed. Appx. at 772 (citations omitted).

"The methods of presenting a prima facie case are flexible and depend on the particular situation." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264

23

(11th Cir. 2010) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). Generally speaking, to satisfy a *prima facie* case for a disparate-treatment claim based on circumstantial evidence, a plaintiff must show: " '(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job.' " *Brown v. Jacobs Eng'g, Inc.*, 401 Fed. Appx. 478, 479-80 (11th Cir. Oct. 28, 2010) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).

Regarding pretext,

A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason.

*Alvarez*, 610 F.3d at 1265-66 (alteration in original) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotation marks omitted)). To avoid summary judgment, a plaintiff " 'must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.' " *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting

24

*Clark v. Coats & Clark, Inc*., 990 F.2d 1217, 1228 (11th Cir. 1993)). In other words, a plaintiff "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

## IV. Discussion

Defendant moves for summary judgment on all of Plaintiff's claims on the grounds that Plaintiff cannot establish a *prima facie* case of age, race, or gender discrimination or retaliation. [Doc. 163-2 at 3]. Specifically, Defendant argues that there is no evidence the Plaintiff was subjected to an adverse employment action or that someone outside of her protected class was treated more favorably. [*Id*. at 5]. It further contends that any failure-to-promote claims Plaintiff may intend to raise are barred as a matter of law because she did not include them in her EEOC charge and therefore failed to exhaust her administrative remedies. [*Id*. at 12]. Finally, Defendant argues that Plaintiff's retaliation claim fails because she did not engage in protected activity until after Defendant's allegedly discriminatory conduct took place and that her

AO 72A
(Rev.8/8
2)

promotion claims fail because it had legitimate nondiscriminatory reasons for appointing the Senior Appraisers it selected. [*Id*. at 14-16].

Plaintiff, in response, clarifies that she does not contend that her transfer to the Pryor Street office was because of her age, race, or gender, but rather that she was reassigned to that office in retaliation for engaging in statutorily protected activity. [Doc. 205-1 at 2]. She argues that she engaged in statutorily protected activity when she "complained that Mr. Brown was showing preferential treatment to African American females under 40," [*id*. at 3]; "told Mr. Brown that it was unfair to hold older, white employees to certain scheduling requirements while showing special treatment to a black female under 40," [*id*. at 3, 7-8]; "complained that younger, black employees were afforded the use of data techs to inspect properties in appeal without the appraiser present while she was not," [*id*. at 7-8]; and complained about being excluded from office functions, [*id*. at 3, 8]. She contends that she suffered material adverse actions when, as a result of her activity, Brown took away her access to certain building permit information; refused to act on her complaints of being excluded from office functions; denied her the privilege of using Data Collectors to help her with her appeals; excluded her from management meetings; and transferred her to a location where she was given new assignments without training, was sent to dangerous areas, and incurred increased

AO 72A
(Rev.8/8
2)

commuting costs. [Doc. 205-1 at 3-4 (citing Plaintiff's EEOC charge of discrimination [Doc. 192-1 at 14-16]), 8]. As proof that Defendant engaged in the accused conduct as a result of Plaintiff's activity, she urges the Court to consider (1) that all of the events took place within a few month of each other; (2) what Plaintiff characterizes as escalating punishment—"from not receiving equal privileges of employment and being ignored and ridiculed, to being transferred; (3) the charges of retaliation brought by the other plaintiffs in this case, "which tend to show an environment that permits retaliation by the same decision makers and management officials"; and (4) the fact that the decisionmakers—Manning, Kirkpatrick, and Brown—were all aware of Plaintiff's activity. [Doc. 205-1 at 9-10].

Plaintiff further contends that she raises a *prima facie* case of discriminatory failure to promote and that although her charge of discrimination did not contain an express complaint regarding discriminatory failure to promote, it should be considered because it could have reasonably "grown out of" the allegations Plaintiff did raise. [Doc. 205-1 at 13]. She also alleges that she was discriminated against as to the "terms, conditions, and privileges of her employment" when Dowdell and Ramos—both younger black employees—were permitted to use data technicians to inspect properties in appeal; when younger black employees were permitted to come in late, take extended

27

lunches, and leave early while Plaintiff was "held to a strict schedule"; and when George gave Ramos a new camera but told Plaintiff he did not have another for her. [Doc. 205-1 at 14-15 & n.12].

Defendant's arguments and Plaintiff's responses are discussed in further detail below. The Court first considers the arguments regarding exhaustion of administrative remedies, then the addresses the retaliation claims, and finally turns to the claims of disparate treatment.

### A.    Exhaustion

Putting aside the question of whether Plaintiff has adequately stated a failure-to-promote claim in the amended complaint, Defendant moves for summary judgment on any such claim Plaintiff may have intended to raise, arguing that she did not exhaust her administrative remedies, cannot show facts sufficient to establish a genuine issue of material fact as to her *prima facie* case, and cannot overcome its reasons for selecting other candidates for Senior Appraiser positions Plaintiff desired. The Court agrees that Plaintiff did not exhaust her administrative remedies and therefore may not pursue a claim for discriminatory failure to promote.

Before bringing a Title VII or ADEA claim in court, a plaintiff must first exhaust her administrative remedies by raising her allegations in a charge of discrimination filed

with the EEOC. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (Title VII); *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1238 (11th Cir. 2004) (ADEA); *see also Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (noting that the purpose of this exhaustion requirement is to allow the EEOC to have "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts"). Administrative exhaustion consists of two elements: timeliness and disclosure of the basis for the charge. *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d). Defendant's motion for summary judgment questions the second element—the disclosure of the basis for the charge. [Doc. 163-2 at 10-13].

Title VII and the ADEA prohibit a plaintiff from alleging new acts of discrimination in the judicial complaint that were not raised in the EEOC charge. *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th Cir. 2005); *Gregory*, 355 F.3d at 1279-80. On the other hand, a plaintiff may bring claims that "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint. *Gregory*, 355 F.3d at 1279 (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)); *see also Parisi*, 400 F.3d at 585 (A plaintiff may bring suit on allegations raised in her EEOC charge, "along with allegations that are 'like or reasonably related' to that claim."). Accordingly, "the

29

proper inquiry" is whether the "complaint was like or related to, or grew out of, the allegations contained in her EEOC charge." *Gregory*, 355 F.3d.at 1280; *see also Parisi*, 400 F.3d at 585 ("The claims of employment discrimination in the complaint may be as broad as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge."). "Courts are nonetheless 'extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII],' " such that the EEOC charge is not to be "strictly interpreted." *Gregory*, 355 F.3d at 1280 (quoting *Sanchez*, 431 F.2d at 460-61, 465).

Plaintiff does not contend that her EEOC charge identifies any claims for discriminatory failure to promote. [*See* Doc. 205-1 at 12-13]. She argues, however, that the Court should accept her discriminatory failure-to-promote claims because they are "like or related to, or grew out of, the allegations contained in her EEOC charge." [*Id*.]. She points out that in her charge, she complains that Kirkpatrick denied her grievance about her transfer because she "had complained at work about several things." [*Id*. [citing Doc. 192-1 at 16]]. She therefore "believes that the EEOC investigation could have encompassed the 'several things' that [Plaintiff] complained about and the subsequent . . . discriminatory promotions that occurred after [Plaintiff]

AO 72A
(Rev.8/8
2)

filed her Charge" and also "could have been investigated as further retaliation." [*See* Doc. 205-1 at 13].

In the judicial complaint, although several of her co-plaintiffs raise specific claims for failure to promote, Plaintiff only very generally alleges that "Plaintiffs were . . . denied promotions . . . based on their gender," (Am. Compl. ¶ 215); "[a]fter Tony George arrived all the promotions seemed to go to young males," (*id.* ¶ 120); and "[y]ounger employees . . . received more promotions . . . despite less experience," (*id.* ¶ 200). Because the claims rest on allegations of class-based preferences rather than retaliation for protected activity, it is clear that to the extent Plaintiff does raise failure-to-promote claims, they are based on allegations of disparate treatment and not retaliation. *See Standard*, 161 F.3d at 1333 (A plaintiff establishes a prima facie case for racially discriminatory failure to promote by showing that "(1) [s]he was in a protected group; (2) [s]he was not given the promotion; (3) [s]he was qualified for the position and (4) someone outside of the protected group was given the position."). In her response to Defendant's motion for summary judgment, Plaintiff defends the claim solely as a disparate-treatment claim, pointing to two specific instances where younger black males were promoted instead of her and one instance where the candidate selected was a younger white female. [Doc. 205-1 at 11-12].

AO 72A
(Rev.8/8
2)

The Court finds that Plaintiff's failure-to-promote claims, to the extent that she does raise them, do not reasonably grow out of her EEOC charge. First, Plaintiff's argument that failure to promote Plaintiff was one of the "several things" the EEOC should have investigated makes no temporal sense. Plaintiff filed her charge of discrimination on or about September 4, 2009. (D ¶ 210; P. Resp. ¶ 210). She does not, however, complain about being denied any promotions before 2010, when she applied for "at least three Senior Appraiser positions." (P ¶ 34; D. Resp. ¶ 34). Thus, it would have been impossible for the alleged discriminatory failure to promote to have been among the "several things" about which Plaintiff had complained.

Second, the Court is unpersuaded by Plaintiff's apparent attempt to bootstrap her disparate-treatment claim into her EEOC charge as a quasi-retaliation claim.[9] Although Plaintiff now contends that the EEOC "could have" investigated later failure to promote as "further retaliation for engaging in protected activity," [Doc. 205-1 at 13], she did not raise such a claim in her pleadings, (*see* Am. Compl., *passim*), and has not filed a motion to amend the complaint to include such a claim, [*see* Dkt.]. Eleventh Circuit

---

[9]     The Court recognizes that the former Fifth Circuit has held "that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge." *Gupta v. E. Tex. State. Univ.*, 654 F.2d 411, 414 (5th Cir. Aug. 28, 1981).

AO 72A
(Rev.8/8
2)

precedent precludes a plaintiff from amending her pleadings via arguments raised in her summary judgment brief. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (concluding that after plaintiff proceeded through discovery without seeking to amend complaint to raise new claim, plaintiff "was not entitled to raise it in the midst of summary judgment"); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Thus, the Court is not persuaded that Plaintiff's charge of discrimination should have reasonably led the EEOC to seek out later charges of disparate treatment.

Third, the failure-to-promote claim is not "like or related to" the allegations in Plaintiff's EEOC charge. In her charge of discrimination, which spans three single-spaced typewritten pages, Plaintiff complains at length about Brown's preferential treatment of young black employees with regard to timeliness requirements, access to permits, and use of Data Collectors; the exclusion and ridicule she suffered in the Alpharetta office; the unwanted transfer to the Pryor Street office and the undesirability of her assignments there; and Plaintiff's wish to be reassigned to the Alpharetta office. [Doc. 192-1 at 14-16]. Nowhere in the entire charge does Plaintiff hint that she had applied for promotions or even intended to, much less that she had

33

been denied promotions. [*See id.*]. Indeed, she complains extensively about lacking resources to properly perform the Property Appraiser position she held. [*See id.*]. As a result, the Court finds that the failure-to-promote claims—to the extent that Plaintiff raises failure-to-promote claims in the amended complaint—would not have grown out of Plaintiff's lengthy and highly detailed charge of discrimination complaining exclusively about her treatment in her Property Appraiser position. Plaintiff also never amended or updated her September 2009 EEOC charge, so there was nothing that would have given the EEOC the opportunity to investigate failure-to-promote claims arising from activity taking place in 2010.

For these reasons, the undersigned **RECOMMENDS** to the District Judge that to the extent Plaintiff raised failure-to-promote claims under Title VII or the ADEA in the amended complaint that Defendant's motion for summary judgment on those claims be **GRANTED**.[10]

_____

[10] It also bears noting that Plaintiff appears to have been represented by counsel when she filed her September 2009 EEOC charge. (*See* Brown Dep., Exh. 1 [Doc. 231-4] at 2, 5 (noting that Plaintiff was represented by legal counsel during the grievance process and requesting reimbursement for attorney's fees incurred in filing the grievance)). Those cases that have found claims growing out of an EEOC charge have emphasized that the plaintiff was proceeding *pro se.* *See Gregory*, 355 F.3d at 1280 (noting that plaintiff's EEOC charge was filed without aid of counsel); *Jerome v. Marriott Residence Inn Barcelo Crestline/AIG*, 211 Fed. Appx. 844, 846 (11th Cir. Dec. 4, 2006); *see also Richardson v. JM Smith*

AO 72A
(Rev.8/8
2)

## A.    Retaliation Claims

To establish a *prima facie* case for a retaliation claim, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action[11]; and (3) there was a causal link between the two. *Dixon v. The Hallmark Cos.,*

---

*Corp*., 473 F. Supp. 2d 1317, 1328 (M.D. Ga. 2007) ("Although we liberally construe EEOC charges that are prepared without the assistance of counsel, 'a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.' ") (quoting *Green v. Elixir Indus., Inc.*, 152 Fed. Appx. 838, 840 (11th Cir. Oct. 11, 2005)). Thus, if an attorney drafts the EEOC charge, the charge need not be given a liberal construction. *Tarrance v. Montgomery Cnty. Bd. of Edu.*, 157 F. Supp. 2d 1261, 1265-66 (M.D. Ala. 2001).

Consequently, if the Court is correct in its perception that Plaintiff was represented by counsel when she filed her EEOC charge, she cannot show that the any discriminatory failure-to-promote claims that might be asserted in her complaint grow out of the charge. Presumably, Plaintiff's attorney knew the law. If Plaintiff's attorney believed that Plaintiff suffered discriminatory failure-to-promote, it seems reasonable that counsel would explicitly raise such allegations in the EEOC charge or in an amendment. Therefore, assuming that Plaintiff was represented when she filed her charge, this is an additional reason that the District Judge may **GRANT** Defendant's motion for summary judgment on Plaintiff's putative failure-to-promote claims.

[11]    In *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008), the Eleventh Circuit recognized that the Supreme Court's decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), broadened the type of employer conduct considered actionable in a retaliation claim, from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related. *Crawford*, 529 F.3d at 973. Therefore, as result of *Burlington Northern* and *Crawford*, the Court concludes that it is inappropriate to refer to this element as the adverse employment action element. *Burlington Northern* explicitly states that "[t]he scope of the anti-retaliation provision extends beyond

AO 72A
(Rev.8/8
2)

*Inc.*, 627 F.3d 849, 856 (11ᵗʰ Cir. 2010); *see also Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11ᵗʰ Cir. 2000); *Holifield v. Reno*, 115 F.3d 1555, 1566 (11ᵗʰ Cir. 1997). To satisfy the first element, a plaintiff need not prove the underlying claim of discrimination that led to his protected activity; it is sufficient if he had "a reasonable good faith belief that the discrimination existed." *Holifield*, 115 F.3d at 1566; *see also Standard*, 161 F.3d at 1328 ("[I]t is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute."). As for the second element, a materially adverse action is one that " 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Reeves v. DSI Sec. Servs., Inc.*, 395 Fed. Appx. 544, 547 (11ᵗʰ Cir. Aug. 31, 2010) (quoting *Burlington Northern*, 548 U.S. at 68). " '[P]etty slights, minor annoyances, and simple lack of good manners' generally do not rise to the level of materially adverse actions." *Reeves*, 395 Fed. Appx. at 547 (quoting *Burlington Northern*, 548 U.S. at 68). To satisfy the third prong, Plaintiff is only required to show

─────────────────

workplace-related or employment-related retaliatory acts and harm." *Burlington Northern*, 548 U.S. at 67. The Court's decision merely requires the employee to show that a reasonable employee would have found the challenged action materially adverse, meaning the reasonable worker would be dissuaded from making or supporting a charge of discrimination. *Id*. at 68 (quotation marks and citations omitted). Thus, it is more appropriate to refer to the "adverse employment action" element as the "materially adverse action" element.

AO 72A
(Rev.8/8
2)

that the "protected activity and the adverse action were not wholly unrelated." *Shotz v. City of Plantation*, 344 F.3d 1161, 1180, n.30 (11th Cir. 2003) ("[A] plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse action.") (alteration and citation omitted); *see also Shotz*, 344 F.3d at 1180, n.30 (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (one month between protected activity and adverse action supports finding of causation)).  Plaintiff's retaliation claims fail on the first element.

In its motion for summary judgment, Defendant argues that Plaintiff did not engage in protected activity until she filed her charge of discrimination with the EEOC—after she had been assigned to the downtown office in 2009. [Doc. 163-2 at 14-15].  Thus, Defendant argues, Plaintiff cannot show that her protected activity led to Defendant's decision to transfer her.  [*Id.* at 16].

Plaintiff responds that she engaged in statutorily protected activity when she complained to Brown in early 2009 that he was allowing younger black women to come in late to work while holding Plaintiff to a strict schedule, [Doc. 205-1 at 7-8]; "complained that younger, black employees were afforded the use of data techs to

inspect properties in appeal without the appraiser present while she was not," [*id*. at 7-8]; and complained about being excluded from office functions, [*id*. at 8].

The undersigned finds that Plaintiff has not presented evidence sufficient to enable a reasonable factfinder to determine that she held an objectively reasonable good-faith belief that she was engaging in statutorily protect activity when she raised the complaints about scheduling, use of Data Collectors, or exclusion from office functions. To show that she held such an objectively reasonable good-faith belief, Plaintiff must show that the employer conduct she complained of was unlawful according to substantive law existing at the time. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). "Where binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit Court of Appeals] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008).

Plaintiff does not attempt to show that her complaints constituted statutorily protected activity but instead simply argues by assertion that they are. [Doc. 205-1, *passim*]. In the section in which she argues that she suffered materially

38

adverse actions in retaliation for the allegedly protected activity, however, she contends that under *Hishon v. King & Spalding*, 467 U.S. 69 (1984), being restricted in the use of Data Collectors constituted a "material effect on her privileges and terms and conditions of employment in a discriminatory manner."[12] [Doc. 205-1 at 4-5]. Thus, rather than consider this portion of Defendant's argument unopposed, the Court will examine whether, under *Hishon*, the alleged unequal treatment as to scheduling, use of Data Collectors, or exclusion from office functions could reasonably be considered an adverse employment action under Title VII or the ADEA and therefore could form the basis for a reasonable belief that complaints about the unequal treatment were statutorily protected.

The Eleventh Circuit Court of Appeals has explained the law on adverse employment actions as follows:

---

[12]     Plaintiff also states—correctly—that the Supreme Court has held that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment of men and women in employment' " and therefore is not limited to "economic" or "tangible" discrimination. [Doc. 205-1 at 14 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986))]. At issue in *Meritor* was whether, lacking a showing of economic damage, sexual harassment could be actionable under Title VII. *Id*. at 62. The Court determined that it could, so long as the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. at 67. Because Plaintiff does not raise a harassment claim, *Meritor* has, at most, limited application to the case at hand.

AO 72A
(Rev.8/8
2)

Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling: the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original).

*Hishon* provides a weak analogy to Plaintiff's claims in this case. The Plaintiff in *Hishon* was an associate attorney passed over for partnership in her law firm and consequently terminated. *Hishon*, 467 U.S. at 72. The Court determined that the plaintiff had adequately stated a Title VII claim for discriminatory denial of privileges of employment based on allegations that "would support the conclusion that the opportunity to become a partner was part and parcel of an associate's status as an employee"—namely that the employer "used the prospect of ultimate partnership to induce young lawyers to join the firm" and that it was known among the associates that they "could regularly expect to be considered for partnership at the end of their

40

'apprenticeships.' " *Id*. at 76. To analogize *Hishon* to the case at hand, the Court would have to find that the promise of flexible scheduling, use of Data Collectors, and participation in office functions were primary factors inducing employees to work for Defendant, such that it became "a term, condition, or privilege of . . . employment." *See id*. at 75-76.

The evidence Plaintiff presents would not enable a reasonable factfinder to make such a determination. Regarding the scheduling, the undisputed evidence shows that Plaintiff worked 9:00 a.m. to 5:30 p.m., in a shift that she selected. (D ¶ 133; P. Resp. ¶ 133). Plaintiff also testified that she always requested leave if she needed to come in late or leave early, and the requests were never denied. (Pl. Dep. at 108-09). While she could not recall whether she ever asked Brown for permission to take an "extended lunch break," (Pl. Dep. at 109), it is undisputed that Plaintiff has never been the recipient of oral counseling, a written warning, or suspension during her employment with Defendant, (D ¶ 17, P. Resp. ¶ 17), which leads to the reasonable inference that she has never been disciplined for any attendance or tardiness issues or for taking extended lunch breaks. Regarding the use of Data Collectors, Plaintiff admits that she was assigned Data Collector Wortham in 2007 and that rather than request that he be allowed to aid her to the extent she believed other Property

41

Appraisers were being helped by their Data Collectors, she instead acquiesced to announced County policy limiting their use and complained that the other Appraisers were receiving more favorable treatment. (D ¶¶ 91-96; P ¶¶ 91-96). The Court has also found no statements in Plaintiff's statements of material fact showing how denial of the use of a Data Collector on appraisals adversely affected her.[13] [*See* Doc. 205-3, *passim*]. Finally, according to the facts presently before the Court, the office functions from which Plaintiff complains of being excluded were employee-organized birthday celebrations and lunches, (D ¶¶ 110-15, 117; P ¶¶ 110-15, 117), and the "management meeting" from which she complains of being "excluded"

---

[13]     Plaintiff cites her own affidavit testimony to show that "[t]he appraisers had quotas they were required to meet and [Plaintiff] took more time to complete her appeals because she did not have the assistance of a data tech/collector to inspect properties in appeal while the other employees did." [Doc. 205-1 at 15 (citing Pl. Aff. ¶ 12)]. Because Plaintiff did not present the evidence in a statement of material fact, the statement is not properly before the Court. *See* LR 56.1B(1)-(2) (noting that both the movant and opposing party must properly set forth evidence in statements of material fact and that "[t]he court will not consider any fact . . . set out only in the brief and not in the . . . statement of undisputed facts"). This is particularly important given the fact that Plaintiff is relying on her own affidavit testimony, which may be disregarded as a sham upon a showing that the affidavit testimony was in direct conflict with her deposition testimony. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003). By failing to present the allegation in her statement of material fact, Plaintiff deprived Defendant of the opportunity to raise such an objection. Regardless, even if the fact were properly presented, it does not establish that the fact that Defendant's activity was materially adverse.

42

AO 72A
(Rev.8/8
2)

was a meeting Brown held with Martinez and Ramos to discuss Plaintiff's complaints of exclusion, (D ¶¶ 118-19; P ¶¶ 118-19). Plaintiff also states that a "management meeting is any meeting involving anyone with a position higher than her own" and that she "would consider any meeting between herself and Brown to be a 'management meeting.' " (D ¶¶ 121-22; P ¶¶ 121-22). The Court has also found no statements in Plaintiff's statements of material fact showing how such exclusions adversely affected her. [*See* Doc. 205-3, *passim*].

To rise to the level of an actionable Title VII claim, employment decisions must work a material alteration on the terms of employment, as opposed to being merely petty slights or trivial annoyances. *See Davis*, 245 F.3d at 1239. The asserted impact "cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Filius v. Potter*, 176 Fed. Appx. 8, 10 (11th Cir. Mar. 15, 2006). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239. While the Court can certainly see that a reasonable person could find that much of the conduct about which Plaintiff complains was petty and annoying, the Court does not find that Plaintiff has presented evidence sufficient for a reasonable factfinder to

43

determine that the conduct was a serious and material alteration to the terms of her employment.

For this reason, the undersigned finds that Plaintiff has failed to proffer evidence sufficient to enable a reasonable factfinder to determine that the activity she alleges forms the basis for her retaliation claims was statutorily protected conduct. The undersigned therefore **RECOMMENDS** to the District Judge that he **GRANT** Defendant's motion for summary judgment on Plaintiff's retaliation claims.

### C. *Disparate Treatment*

Defendant also asserts that Plaintiff has not shown direct evidence of age, race, or gender discrimination and cannot proffer circumstantial evidence sufficient to state a *prima facie* case of age, race, or gender discrimination. [Doc. 163-2 at 3-10]. As noted above, to state a disparate-treatment claim under Title VII based on circumstantial evidence, a plaintiff must show: " '(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside her class more favorably; and (4) she was qualified to do the job.' " *Brown*, 401 Fed. Appx. at 479-80 (quoting *Maniccia*, 171 F.3d at 1368). Similarly, a plaintiff establishes a *prima facie* case of age discrimination under the ADEA if she shows: "(1) that she was a member of the protected group of persons

between the ages of forty and seventy; (2) that she was subject to adverse employment action"; (3) that a "substantially younger person" was treated more favorably; and (4) "that she was qualified to do the job for which she was rejected." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (citations omitted)).

Defendant does not challenge Plaintiff's membership in a protected class or question whether she was qualified to do her job. [Doc. 163-2, *passim*]. It does, however, argue that Plaintiff's disparate-treatment claims fail because there is no evidence that Plaintiff was subjected to an adverse employment action or that someone who was outside Plaintiff's protected gender class or who was substantially younger than Plaintiff was treated more favorably. [*Id.* at 5].

Plaintiff, in response, contends that she was subjected to adverse employment actions and that younger black employees were treated more favorably when Plaintiff received unequal treatment as to scheduling and use of Data Collectors. [Doc. 205-1 at 14-15]. She also alleges that in mid-2009, George issued Ramos a camera but refused to give one to Plaintiff. [*Id.* at n.12]. She contends that this constituted denial of "privileges of employment," as proscribed in *Hishon*. [*Id.* at 14

45

(citing *Hishon*, 467 U.S. at 75-76)]. Defendant again argues that its actions were not sufficiently objectively serious or tangible to rise to the level of an "adverse employment action." [Doc. 221 at 12-17].

The undersigned has already described why, to succeed under *Hishon*, Plaintiff would need to show that the use of Data Collectors or the scheduling flexibility she desired was a primary factor inducing Plaintiff to work for Defendant, such that it became "a term, condition, or privilege of her employment." *See supra* Part IV(B); *see also Davis*, 245 F.3d at 1239 (holding that to succeed in showing that an employer's conduct constituted an adverse employment action, the plaintiff must show evidence that would allow a reasonable objective factfinder to determine that the employer's conduct impacted the " 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way" and caused "a *serious and material* change in the terms, conditions, or privileges of employment"). The Court has also found that Plaintiff has proffered no facts to show that the use of Data Collectors or additional scheduling flexibility was so central to her employment with Defendant. *See supra* Part IV(B).

Plaintiff's allegations regarding the denial of a camera are similarly sparse. Defendant cites Plaintiff's deposition testimony in which she states that when she had loaned her camera to someone, it had been dropped and damaged. (D ¶ 196

AO 72A
(Rev.8/8
2)

(citing Pl. Dep. at 119); P. Resp. ¶ 196). In the testimony, Plaintiff stated that afterward, she could "jury rig it and make it to work, but it wasn't a 100 percent functioning camera." (Pl. Dep. at 119). In support of her allegation that denial of a camera was an adverse employment action, Plaintiff avers in her statements of material fact only that "George . . . provided Ramos with a camera for work purposes but refused to give one to [Plaintiff], saying that he did not have anymore." (P ¶ 65; Pl. Aff. ¶ 21). This factual statement, even when viewed in the light most favorable to Plaintiff, is clearly insufficient to allow a reasonable factfinder to determine that assignment of a new camera was so central to Plaintiff's employment with Defendant that it constituted a "serious and material" term, condition, or privilege of her employment. Plaintiff also does not cite any cases in which a court found that a plaintiff provided tools adequate to do her work nevertheless suffered an adverse employment action by being denied new ones.

For these reasons, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** summary judgment to Defendant on the disparate-treatment claims arising from unequal treatment as to scheduling and use of Data Collectors and from Defendant's refusal to provide Plaintiff with a new camera.

AO 72A
(Rev.8/8
2)

*V.* *Conclusion*

For the reasons set forth above, the undersigned **RECOMMENDS** to the District Judge that he **GRANT** Defendant's motion for summary judgment as to all of the claims raised by Plaintiff Pascoli. [Doc. 163].

Reports and Recommendations on the remaining pending summary-judgment motions will be forthcoming under separate cover.

**IT IS SO RECOMMENDED**, this the 4th day of February, 2013.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)